IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **JOHN W. NORTH,** )<br>)<br>  **Plaintiff,**  )<br>)<br>vs.  )<br>)<br>**CAROLYN W. COLVIN,**  )<br>**Acting Commissioner of Social**  )<br>**Security,**  )<br>)<br>  **Defendant.**  ) | Civil No. 15-cv-269-CJP[1] |

**MEMORANDUM and ORDER**

**PROUD, Magistrate Judge:**

In accordance with 42 U.S.C. §405(g), plaintiff John W. North is before the Court, represented by counsel, seeking review of the final decision of the Commissioner of Social Security denying him Disability Insurance Benefits (DIB).

**Procedural History**

Plaintiff applied for benefits on August 25, 2011 alleging disability beginning on November 2, 2009. (Tr. 19). After holding an evidentiary hearing, ALJ Theodore W. Grippo denied the application for benefits in a decision dated November 15, 2013. (Tr. 19-29). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this court.

**Issues Raised by Plaintiff**

---

[1] This case was referred to the undersigned for final disposition on consent of the parties, pursuant to 28 U.S.C. §636(c).  See, Doc. 12.

1

Plaintiff raises the following points:

1. The ALJ failed to account for deficits of concentration, persistence, or pace within the RFC.

2. The ALJ erred by failing to consider the VA's disability ratings of plaintiff.

## Applicable Legal Standards

To qualify for DIB, a claimant must be disabled within the meaning of the applicable statutes. For these purposes, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." **42 U.S.C. §423(d)(1)(A).**

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques. **42 U.S.C. §423(d)(3).** "Substantial gainful activity" is work activity that involves doing significant physical or mental activities, and that is done for pay or profit. **20 C.F.R. §§ 404.1572.**

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled. The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is

2

> considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

**Weatherbee v. Astrue, 649 F.3d 565, 568-569 (7th Cir. 2011).**

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience.  **20 C.F.R. §§ 404.1520; Simila v. Astrue, 573 F.3d 503, 512-513 (7th Cir. 2009); Schroeter v. Sullivan, 977 F.2d 391, 393 (7th Cir. 1992).**

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three.  If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job.  **Rhoderick v. Heckler, 737 F.2d 714, 715 (7th Cir. 1984). See also Zurawski v. Halter, 245 F.3d 881, 886 (7th Cir. 2001)**(Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant

reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." **42 U.S.C. § 405(g)**. Thus, this Court must determine not whether plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. **See,** ***Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996)** (citing ***Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)**). This Court uses the Supreme Court's definition of substantial evidence, i.e., "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." ***Richardson v. Perales*, 91 S. Ct. 1420, 1427 (1971).**

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does <u>not</u> reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. ***Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997)**. However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. See, ***Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.**

### The Decision of the ALJ

4

ALJ Grippo followed the five-step analytical framework described above. He determined that plaintiff had not been engaged in substantial gainful activity since his alleged onset date. He found that plaintiff had severe impairments of an affective disorder and sensorineural hearing loss bilaterally. The ALJ further determined these impairments do not meet or equal a listed impairment.

The ALJ found that plaintiff had the residual functional capacity (RFC) to perform work at the medium level, with physical and mental limitations. Based on the testimony of a vocational expert (VE), the ALJ found that plaintiff was not able to do his past work. However, he was not disabled because he was able to do other jobs which exist in significant numbers in the regional and national economies.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

**1. Agency Forms**

Plaintiff was born on December 10, 1949, and was fifty-nine years old on the alleged onset date of November 2, 2009. He was insured for DIB through December 31, 2013. (Tr. 158). He was five feet ten inches tall and weighed one hundred and eighty pounds. (Tr. 162). Plaintiff completed four years of college in 1975 but had no specialized job training. (Tr. 162-63). He previously worked

as a trust banker for thirty-two years and as a self-employed tax preparer for ten years. (Tr. 163).

In August 2011, plaintiff initially stated that depression limited his ability to work. (Tr. 162). He took Wellbutrin to help with his depression. (Tr. 164). In October 2011, plaintiff indicated that musculoskeletal issues like joint and tendon degradation in his right shoulder, left hip, and left knee should have also been included in his initial report. (Tr. 220). He then reported he was taking Amitriptyline and Bupropion for anxiety and depression; Ciprofloxacin for prostatitis; Dicyclomine for pylorospasms and stomach pain; Hydrocodone for pain; Omeprazole for GERD; Pravastatin for high cholesterol; Valsartan for high blood pressure; and Zolpidem for insomnia. (Tr. 223-24). These medications caused plaintiff to have headaches, nausea, and throat swelling. (Tr. 223-24).

Plaintiff completed function reports in September 2011 and January 2012. (Tr. 205-12, 228-35). He stated that mood swings, anxiety, anger, insomnia, nightmares, lethargy, sadness, tearfulness, slowness in thought, and thoughts of suicide limited his ability to work. (Tr. 205, 228). His daily activities included watching television, using the computer, reading books, some cleaning, and a weekly veteran's support group. (Tr. 206, 229). He had no problems with personal care and was able to perform some house and yard work. (Tr. 206-07, 229-30).

Plaintiff could drive a car but preferred to have his wife drive. (Tr. 208, 231). He could handle his finances and had no problems following written or spoken

instructions. (Tr. 209-10. 232-33). He stated that lifting, squatting, bending, standing, reaching, walking, kneeling, hearing, climbing stairs, completing tasks, concentrating, understanding, using his hands, and getting along with others affected his ability to work based on his physical ailments. (Tr. 233). Plaintiff had been fired from his previous job due to disagreements he had with his boss. (Tr. 211, 234). He stated that his Wellbutrin caused headaches, insomnia, anxiety, and dizziness. (Tr. 212, 235).

Plaintiff's wife also completed a function report in September 2011. (Tr. 183-90). They lived in a home together but plaintiff had become anti-social and his depression kept him from friends and other family. Plaintiff's wife stated that she witnessed plaintiff become angry and extremely depressed to the point of making himself immobile at times. (Tr. 183). Plaintiff's wife usually prepared his meals but he occasionally ate on his own and prepared his own meals. Plaintiff mowed the yard and cleaned the garage and floors in the home. (Tr. 185). Plaintiff read and watched some television but preferred to be alone. (Tr. 187). Plaintiff had difficulty with his boss at his last place of employment but typically got along well with coworkers and was well respected. (Tr. 189).

### 2. Evidentiary Hearing

Plaintiff was represented by counsel at the evidentiary hearing on September 17, 2013. (Tr. 35). He spent most of his career, from 1976 to 2008, as a trust officer at a bank. He had special training in trust taxes. (Tr. 47). He was fired in 2008 due to performance and because he had issues with his boss. In 2010 he prepared two income tax returns for his friends and earned around

7

five hundred dollars. (Tr. 48). He was terminated at two jobs previously for poor work performance and issues with the employers. (Tr. 49-50).

Plaintiff testified that his depression, insomnia, anxiety, anger, and pain in his elbows, shoulders, lower back, left knee, and right toe prevented him from working. (Tr. 38-39, 41). He received mental health treatment through the Veterans Administration (VA) where he had a psychiatrist and participated in group counseling. (Tr. 39). He took Bupropion and Amitriptyline for depression and anxiety. (Tr. 39-40). Plaintiff also testified that he frequently had prostatitis, and infection of the prostate. It was caused by stress and anxiety and the Amitriptyline helped him decrease the occurrences of prostatitis. (Tr. 40). He testified that he did not think he slept more than five hours on a typical night. (Tr. 41). He occasionally took naps and most days he felt lethargic. (Tr. 42).

Plaintiff testified that he had trouble concentrating and as a result he had difficulty looking long term and constructing the future in his mind. He stated that he had anger issues, some of which were reactive to nightmares. (Tr. 42). He had road rage, got into a fight at Best Buy, frequently lashed out at his wife, and occasionally broke things in their home. (Tr. 42-43). Plaintiff stated he had anxiety attacks when he heard loud noises. The anxiety attacks would cause him to hear gunshots, helicopter and jet sounds, and he would have to get away from the situation. (Tr. 43). He stated that he knew his mental illnesses contributed to losing his job in 2008 because he could no longer cope with changes and difficulties in the workplace. (Tr. 49).

Plaintiff also testified about his physical ailments. He stated that the pain in his elbows was a four out of ten on the right elbow and a two out of ten on the left. (Tr. 43). He stated that the pain in both shoulders was a six out of ten and the heaviest thing he could carry was a twenty pound grocery bag. (Tr. 43-44). He did not think he was capable of lifting and carrying twenty pounds for two hours out of an eight hour day because of his elbow, shoulder, and back pain. He had pain in his knee that he rated as a six to seven out of ten. (Tr. 44).

Plaintiff could stand in one spot for about thirty minutes before his knees, feet, and toe began to hurt. (Tr. 44). He felt he could be on his feet for a total of an hour or two in an eight hour day due to pain. He had sharp pain in his lower back when he lifted anything or bent over. (Tr. 45). Plaintiff also stated that he needed to get up and stretch after thirty to forty-five minutes of sitting. (Tr. 46). He testified that he had difficulty hearing due to tinnitus in his left ear. (Tr. 54-55).

A vocational expert (VE) also testified. (Tr. 57-59). The ALJ asked the VE a hypothetical question which comported with the ultimate RFC assessment, that is, a person of plaintiff's age, work history, and educational background that was able to perform medium work in an environment that is no louder than a typical office. Additionally, the individual would be limited to work that is simple, routine, and repetitive with changes that are few and easily explained, only occasional interaction with coworkers and supervisors, and no interaction with the general public. (Tr. 58).

The VE testified that the person could not perform plaintiff's work. However, the individual could perform work that existed in significant numbers in the national economy. (Tr. 58). Examples of such jobs were janitor, groundskeeper, and laundry worker. (Tr. 58-59). The VE stated that if the person had off task behavior up to twenty percent of the workday due to depression, anxiety, and fatigue all work would be precluded. Additionally, if the person missed two or more days a month due to physical impairments all work would be eliminated. (Tr. 59).

### 3. Medical Records

Plaintiff has extensive medical records for his mental and physical ailments. Since plaintiff's points are based solely on his mental impairments, this Court will focus on the medical records that relate to these impairments.

Plaintiff began receiving mental health treatment in June 2009 at Illinois Associates in Psychiatry. (Tr. 288-89). This record indicates plaintiff had been out of work for several months and "now has come to enjoy being off work, and plans not to return to work." (Tr. 288). This record also shows plaintiff had a history of severe depression, suicidal thoughts, PTSD from the Vietnam War and witnessing his daughter's death, and anger issues. (Tr. 288).

Most of plaintiff's mental health treatment was done at the VA. (*Ex.*, Tr. 311, 501-5, 685, 871, 949, 1047-48, 1224-5, 1235-6). He began receiving treatment from the VA in September 2009 where he received an initial psychological assessment. (Tr. 304-07). The doctor that examined plaintiff noted that his

mood and affect were depressed, he had difficulty concentrating, he was easily angered, and that he would benefit from psychotherapy services. (Tr. 304-07).

Thereafter, plaintiff went to monthly group and individual psychotherapy sessions. (*Ex.*, Tr. 311, 471, 685, 871, 949, 1047-48, 1224-5). He was typically assessed with depression, difficulty concentrating, anxiety, anger issues with emotional outbursts, and PTSD. (*Ex*, Tr. 311, 321-22, 328, 435, 440, 591, 685, 957, 960).

**4. Treating Psychiatrist's Opinion**

In September 2011, plaintiff underwent a psychiatric evaluation with Dr. Jay Liss who plaintiff saw on several occasions at the VA. (Tr. 501-03, 553, 949-65). Dr. Liss stated that plaintiff presented with alteration in sleep, poor concentration, general anxiety, social anxiety, isolation, decreased self-esteem, suicidal thoughts, delusions, compulsive behaviors, mood swings, thoughts to harm others, alteration in appetite, memory difficulty, altered judgment, hopelessness, obsessive thoughts, and angry outbursts. (Tr. 502). Dr. Liss noted that plaintiff did not have delusions but did have flashbacks with panic attacks and dissociation of a hallucinatory nature due to his time in Vietnam. He diagnosed plaintiff with PTSD, anxiety, and depression. He assigned plaintiff a GAF[2] score of 30 due to the severity of his PTSD. (Tr. 503). Dr. Liss further explained that plaintiff satisfied the VA's qualifications for 70-100%

---

[2] The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. *American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders* - Fourth Edition, Text Revision 32-33 (4th ed. 2000); Although the American Psychiatric Association recently discontinued use of the GAF metric, it was still in use during the period plaintiff's examinations occurred.

disability with unemployability due to flattened affect, panic attacks, difficulty in understanding complex commands, impairment of short and long-term memory, impaired judgment, disturbances of mood and motivation, difficulty in maintaining effective work and social relationships. (Tr. 503).

### 5. Consultative Examination

In February 2013, plaintiff had a physical consultative examination with Dr. Raymond Leung. (Tr. 893-99). Plaintiff stated he had right shoulder pain, a left knee meniscus tear, and low back pain. (Tr. 893). Plaintiff had no noticeable musculoskeletal problems and his speech and hearing were within normal limits. (Tr. 894-95). Dr. Leung's clinical impressions were right shoulder pain, left knee surgeries for meniscus tear, and low back pain. Dr. Leung stated that plaintiff's right shoulder adduction was limited to twenty degrees but the right arm strength was the same as the left. Both of plaintiff's knees showed a full range of motion but plaintiff's forward flexion in his lumbar spine was limited to eighty-five degrees. (Tr. 895).

### 6. RFC Assessments

State agency psychologist Joseph Mehr completed a psychiatric review technique and a mental residual functional capacity (RFC) assessment in October 2011. (Tr. 506-22). He reviewed plaintiff's medical records but did not examine plaintiff in person. In the psychiatric review technique, Dr. Mehr stated that plaintiff had moderate limitations in his activities of daily living, maintaining social functioning, and maintaining concentration, persistence, or pace. (Tr. 516). Within the RFC assessment, Dr. Mehr opined that plaintiff was

moderately limited in his ability to understand, remember, and carry out detailed instructions. (Tr. 521).

In March 2012, state agency physician Towfig Arjmand completed a physical RFC assessment. (Tr. 900-07). He also evaluated plaintiff's medical records but did not examine plaintiff in person. Dr. Arjmand opined that plaintiff could occasionally lift or carry fifty pounds and frequently lift or carry twenty-five pounds. He stated that plaintiff could sit, stand, or walk for six hours out of an eight hour workday. (Tr. 901). He based these opinions on the joint degradation in the right shoulder, left hip, and left knee. (Tr. 907).

## Analysis

Plaintiff contends that the ALJ erred by failing to account for deficits of concentration, persistence, or pace within the RFC and by failing to consider the VA's disability ratings of plaintiff.

The ALJ's RFC limited plaintiff to simple, repetitive, routine work with few changes that are easily explained, as well as occasional interactions with supervisors and no interaction with the general public. (Tr. 24). ALJ Grippo also found that plaintiff had moderate difficulties in concentration, persistence, or pace. (Tr. 24). Plaintiff states that the RFC accounts for difficulties in job complexity, supervision of stress, and social interaction but fails to account for plaintiff's issues in concentration due to PTSD and depression.

Plaintiff cites the Seventh Circuit opinion in ***O'Connor-Spinner vs. Astrue*** to support his argument. **627 F.3d 614 (7th Cir. 2010).** In ***O'Connor-Spinner***, the Court emphasized that "for most cases, the ALJ should refer

13

expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations and assure reviewing courts that the VE's testimony constitutes substantial evidence of the jobs a claimant can do." **O'Connor-Spinner, 627 F.3d at 620-21.**

The Commissioner argues that ***O'Connor-Spinner*** is not dispositive in the case at hand because the ALJ in ***O'Connor-Spinner*** included the phrase "moderate limitations in concentration, persistence, and pace" in the RFC finding. The Commissioner entirely misreads the opinion in ***O'Connor-Spinner***. The situation in that case is actually remarkably similar to the situation presented here. Ms. O'Connor-Spinner suffered from depression and a state agency psychologist concluded that she had moderate limitation of concentration, persistence and pace. The ALJ agreed. The ALJ asked the vocational expert a series of hypothetical questions. The most restrictive hypothetical question restricted the person to routine, repetitive tasks with simple instruction, but did not include a limitation on concentration, persistence, or pace. The ALJ's RFC assessment reflected the questions he asked the VE and did not include the limitation on concentration, persistence, or pace.

The Seventh Circuit held that the ALJ's decision was not supported by substantial evidence because the vocational expert was not asked to assume a limitation on concentration, persistence and pace. While the Court stated that there is no per se requirement that the phrase "concentration, persistence and

14

pace" be used in the hypothetical, it went on to hold that the restriction to simple, repetitive tasks is not an adequate substitute because it "will not necessarily exclude from the VE's consideration those positions that present significant problems of concentration, persistence and pace." ***O'Connor-Spinner, Ibid.***

Plaintiff also cites the Seventh Circuit's opinion in ***Yurt v. Colvin***. **758, F.3d 850 (7th Cir. 2014)**. In ***Yurt***, the Court stated "[W]e have repeatedly rejected the notion that a hypothetical like the one here confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." ***Yurt,* 758 F.3d at 859.** Under ***Yurt*** and ***O'Connor-Spinner,*** if a claimant has limitations in maintaining concentration, persistence and pace, those limitations must be spelled out in the RFC assessment and in the hypothetical question posed to the VE.

As plaintiff notes, the record indicates plaintiff had a concentration deficit, in the psychiatric review technique the state agency psychologist found plaintiff had a moderate limitation in concentration, persistence, or pace, and the ALJ stated plaintiff was moderately limited in concentration, persistence, or pace as well. (Tr. 24, 516, 305, 311, 502, 516, 520, 862, 876, 883, 911, 915, 952, 1211-2, 1223). However, the ALJ did not include any limitations that account for a deficit in concentration, persistence, or pace within his RFC assessment. This is error.

The Commissioner argues that the psychiatric review technique is only used to identify cases that could be resolved without further analysis in the early stages of the case. She states it is applicable when the claimant's impairments are not severe (step two), or because they are so plainly debilitating that they meet or medically equal a listed impairment (step three). However, as plaintiff notes, this is a very limited interpretation of the psychiatric review technique. When a mental impairment is involved, the psychiatric review technique is used to determine the "severity of mental impairments," whether additional evidence is needed, to "[c]onsider and evaluate functional consequences of the mental disorder[s] relevant to [the] ability to work," and to "organize and present [] findings in a clear, concise, and consistent manner." 20 C.F.R. §404.1520a(a)(1-3).

The regulations that explain the RFC assessment note how the psychiatric review technique is to be used. SSR 96-8p states:

> The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process. The mental RFC assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraphs B and C of the adult mental disorders listings in 12.00 of the Listing of Impairments, and summarized on the PRTF.

Essentially, the psychiatric review technique is the summary, and the RFC assessment is the more detailed assessment of the claimant's capabilities. The psychiatric review technique is not solely used to determine severity, but rather to guide the ALJ as he forms his RFC assessment. As plaintiff notes, the need for consistency within the psychiatric review technique and the RFC assessment is stated plainly in 20 C.F.R. §404.1520a. This consistency requirement does not allow for the ALJ to discard his findings in the psychiatric review technique when forming his RFC assessment, as the ALJ did in the case at hand.

    The Commissioner argues that the ALJ adequately accounted for plaintiff's limitations and formed a well-reasoned opinion. She notes that the ALJ considered plaintiff's statements about disabling symptoms and noted that plaintiff completed individual tax returns during the period of alleged disability, plaintiff could manage funds, and stated on record that he enjoyed not working. She argues that the ALJ looked at plaintiff's medical records as a whole and considered favorable and unfavorable evidence within his opinion.

    The Commissioner's arguments attack a straw man and avoid plaintiff's primary point. Plaintiff does not argue that the ALJ poorly explained how he formed the portions of the RFC assessment that are present. Plaintiff contends the ALJ failed to integrate the moderate difficulties in concentration, persistence, or pace that he found to exist within his RFC assessment. Plaintiff's other limitations may have been well accounted for and the rest of the ALJ's opinion may have been well supported. However, the fact that the

ALJ adequately explained some portions of his opinion does not negate the fact that he did not account for plaintiff's concentration deficit in his hypotheticals to the VE or within his RFC assessment.

The ALJ is "required to build a logical bridge from the evidence to his conclusions." **Simila v. Astrue, 573 F.3d 503, 516 (7th Cir. 2009).** The ALJ needed to explain how simple, repetitive, routine work with few changes that are easily explained would account for plaintiff's moderate limitations in concentration, persistence or pace. ALJ Grippo simply failed to do so here. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." **Kastner v. Astrue, 697 F.3d 642, 646 (7th Cir. 2012)., citing Steele v. Barnhart, 290 F.3d 936, 940 (7th Cir. 2002).**

It is not necessary to address plaintiff's other points at this time. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff is disabled or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying John North's application for social security disability benefits is REVERSED and REMANDED to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

**IT IS SO ORDRED.**

**DATE: June 6, 2016.**

            **s/ Clifford J. Proud**

            **CLIFFORD J. PROUD**

            **UNITED STATES MAGISTRATE JUDGE**